**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

UNITED STATES OF AMERICA,

      vs.

GONZALO ORTIZ,

               Defendant.

_____

DECISION AND ORDER
06-CR-6076

## INTRODUCTION

The defendant is charged in a three-count indictment with possession of a firearm and ammunition as a felon, possession of cocaine base, and possession of marijuana. By Notice of Motion filed on November 2, 2006, the defendant sought various forms of relief, including suppression of tangible evidence, consisting of cocaine base and marijuana,[1] as well as statements he purportedly made. In regard to the suppression application, the Court ordered a hearing, which was held on December 5, 2006. Based upon the evidence introduced at the hearing, the Court now makes its Findings of Fact and reaches its Conclusions of Law.

## FINDINGS OF FACT

Flamur Zenelovic is a uniformed police officer with the City of Rochester Police Department, and has been so employed for just under four years. He is assigned to the patrol shift on the east side of the city. Prior to his employment with the Rochester Police

_____

[1]The defendant did not move to suppress the handgun that was seized in connection with the subject indictment.

department, he served as a police officer with the City of  Stewart, Florida Police Department for eight-and-a-half years, where for the first three years he was assigned to street patrol as a uniformed officer and then for the remaining five-and-a-half years was assigned to the narcotics enforcement unit as an investigator. As a police officer with both the city of Rochester and the city of Stewart, he had been involved in alcoholic beverage enforcement, and, prior to February 8, 2006, he had made approximately two hundred open  container arrests, dealing with a variety of cans and bottles.

Before serving as a police officer with the Stewart Police Department, he was employed in Rochester at Tops Supermarkets, where he worked at a number of different stores as a stock clerk, an assistant grocery manager, and assistant store manager. Among his responsibilities as an assistant grocery manager was  working with the beer vendors, making sure the aisles were properly stocked, as well as ordering and displaying beer and other alcoholic beverages.

On February 8, 2006, Officer Zenelovic was working the 3:15 p.m. to 11:30 p.m. shift,  investigating drug activity on Joseph Place in the city of Rochester.  Joseph Place is an open-air drug market. Prior to February 8, 2006, Officer Zenelovic had made a number of enforcement stops or contacts on Joseph Place, including arrests for possession of  marijuana and for possession of cocaine. He had also  assisted other officers with similar investigations on Joseph Place.  Moreover, prior to February 8, 2006, he had been involved in one arrest for possession of a firearm on Joseph Place.

At approximately 7:20 p.m. on February 8, 2006, Officer Zenelovic was in his marked patrol vehicle traveling eastbound on Joseph Place, proceeding from Joseph Avenue, with his high beams on looking for suspicious activity. As he approached what

turned out to be 72 Joseph Place, he observed two males standing directly in front of that location on the city sidewalk. One of the males, the defendant,  was holding a brown bag out of which, Officer Zenelovic could observe, was sticking the top one to two inches of a clear glass bottle.   Relying on his experience and training as a police officer and assistant grocery manager, Officer Zenelovic concluded because of how the top of the  bottle was shaped, because it was glass and not plastic, and because he was aware that paper bags were utilized to conceal the labels on alcoholic beverages, it was a beer bottle and that the defendant was committing an open container violation.

Officer Zenelovic  pulled his vehicle to a stop against the left side of the street, so that his  driver's side door was against the curb immediately in front of 72 Joseph Place. As he did so, the defendant and the other male, Felix Valentine, who was fifteen or sixteen, moved backwards onto the driveway at 72 Joseph Place to the  front steps. The defendant sat down on the steps while Valentine remained standing. The distance from the sidewalk to the front steps of 72 Joseph Place was about twelve to fifteen feet. While sitting in the front seat of his vehicle, Officer Zenelovic asked the defendant, who was still holding what Officer Zenelovic had concluded was a bottle of beer, if he lived at that location. The defendant responded no.   At that point, Officer Zenelovic got out of his vehicle and approached the defendant and the other male, who were still sitting on the front steps of 72 Joseph Place. He was joined at that time by another police officer, Paul Dondorfer, who had arrived at the scene.   As Officer Zenelovic was approaching, the defendant explained that he lived around the corner.  Officer Zenelovic then  asked if either the defendant or Valentine had identification, and neither one did. Upon approaching the individuals, Officer Zenelovic could see that the bottle, which the defendant was holding with both hands in

his lap, did not, in fact, have a top on it. He then directed the defendant to put the bottle

down, and the defendant complied. Once the defendant had put the bottle down, Officer

Zenelovic directed him to stand up and put his hands behind his back. The defendant

stood up, but placed both of his hands into the pockets on the front of his coat.  The

defendant was wearing a dark heavy style winter parka jacket, jeans, and a hat.  Officer

Zenelovic told the defendant to remove his hands from his pockets and, at the same time,

reached for the defendant's left hand, which was closest to him, pulling it from the

defendant's left pocket. The defendant responded by pulling his right hand from his right

pocket and throwing an object, which Officer Zenelovic recognized to be a handgun,

toward the front porch. Upon observing the handgun, Officer Zenelovic immediately pulled

the defendant away from the porch area and handcuffed him. While he was being

handcuffed, the defendant said, in sum and substance, that the gun was not his, and that

he was holding it for someone. This statement of the defendant was not made in response

to any question by Officer Zenelovic or by Officer Dondorfer. Officer Dondorfer took

custody of the defendant and placed him in his police vehicle. Before doing so, however,

Officer Dondorfer searched the defendant in Officer Zenelovic's presence, finding a bag

of marijuana and a bag of rock-like substance identified as crack cocaine.[2] While being

searched by Officer Dondorfer, the defendant stated, "the cocaine wasn't his, that, that

wasn't his either." Again, this statement on the part of the defendant was not made in

response to any questioning by either Officer Dondorfer or  Officer Zenelovic.

Subsequently, the defendant was transported to the fourth floor of the Public Safety

---

[2]Crack cocaine is cocaine base.

Building.

After the defendant was taken into custody and placed into Officer Dondorfer's vehicle, Officer Zenelovic seized the brown bag and bottle evidence, which he turned into the Property Clerk's Office. However, he poured out the contents of the bottle, which through smell, he identified as beer. The defendant was charged with Possessing an Open Container, a City of Rochester Municipal Code violation and with Unlawful Possession of Marijuana, Criminal Possession of a Controlled Substance 7th Degree, and Criminal Possession of a Weapon, all New York State Penal Law violations.

Charles LoFaso has been employed by the Rochester Police Department, since June 28, 1999 as a police officer, and, since March 30, 2005, has been an investigator assigned to the east division office. On February 8, 2006, he was working the 3:15 p.m. to 11:30 p.m. shift. At approximately 8:35 p.m. on February 8, 2006, Investigator LoFaso came into contact with the defendant, who was in an interview room in the criminal investigation area on the fourth floor of the Public Safety Building.  Investigator LoFaso was accompanied by his partner Investigator Guidici. The defendant may have been handcuffed inside the interview room.  Investigator LoFaso first asked the defendant if he needed to use the restroom to which the defendant replied, "yes." The defendant was taken out of the interview room for that purpose.

Upon the defendant's return to the interview room,  Investigator LoFaso, in Investigator Guidici's presence, read the defendant his five *Miranda* rights exactly as they appear on one side of  Exhibit # 5 in evidence. Before doing so, however,  Investigator LoFaso completed the informational side of Exhibit # 5 by documenting the date and time, as well as the  defendant's name and the police officers present in the room. He also

asked the defendant what was the last grade he completed and whether he could read and write English, and recorded the defendant's answers, eleventh grade and yes, respectively. Investigator LoFaso then proceeded to read the five *Miranda* rights printed on the reverse side of the card. After doing so, Investigator LoFaso asked the defendant the waiver questions appearing on the card. Specifically, he asked the defendant if he understood the rights he read to him, to which the defendant replied, "yea I understand the rights." Investigator LoFoso next asked the defendant if he would agree to give up his rights and talk to him and Investigator Guidici, to which the defendant replied, "yes, it's all good." Investigator Lofaso concluded that the defendant was not intoxicated based upon the fact that the defendant's speech was clear, based upon the fact that the defendant's eyes were not red, and based upon the fact that he did not smell any odor of an alcoholic beverage on the defendant's breath.

Then Investigator Lofaso and Investigator Guidici proceeded to interview the defendant in question and answer form for approximately eighteen minutes. Investigator LoFaso and Investigator Guidici spoke to the defendant about the gun, and Investigator LoFaso told him that they wanted to get his side of the story. Investigator LoFaso also told the defendant it would be to his benefit to be truthful. The defendant appeared to be somewhat nervous. In responding to questions concerning the gun, the defendant said "Man, it's not my gun. I held the gun, man, I held it for John." The defendant also told Investigator LoFaso and Investigator Guidici that the "weed was his, but the crack was not." When interviewing the defendant, neither Investigator LoFaso nor Investigator Guidici threatened him, used physical force on him, or made him any promises of any kind to get him to talk to them. Further, during the interview the defendant never indicated that

he wished to stop speaking to Investigator LoFaso and Investigator Guidici, nor did he ever request to speak to an attorney. At the conclusion of this interview, Investigator LoFaso and Investigator Guidici left the room.

Subsequently, someone informed Investigator LoFaso that the defendant wanted to speak to either him or Investigator Guidici again. So, at about 9:00 p.m., Investigator LoFaso re-entered to the interview room. After returning, Investigator LoFaso was with the defendant for about six or seven minutes. During this time, the defendant repeated what he had said earlier to Investigator LoFaso and Investigator Guidici: that he was holding the gun for someone named John; and that the weed was his, but the crack was not. Investigator LoFaso responded, "I don't believe you," to which the defendant replied, "No, really, it's John's gun." Investigator LoFaso then said, "Is that all you have to say, because you already told us that before," and the defendant stated, "Yeah, that's all I have to say." During this period of time, the defendant never indicated to Investigator LoFaso that he wished to stop talking, or that he wanted to speak to a lawyer, and Investigator LoFaso never threatened him, used physical force on him, or made him any promises to get him to talk. At the conclusion of the six or seven minutes, Investigator LoFaso advised a fellow officer that he could take the defendant to booking.

## CONCLUSIONS OF LAW

A.    Motion to Suppress Cocaine Base and Marijuana

In moving to suppress the cocaine base and marijuana discovered on his person, the defendant maintains:

> The police did not have reasonable suspicion to believe criminal activity was afoot or that Mr. Ortiz was armed and dangerous. Likewise, the police did not have probable cause to believe a crime had occurred.

(Affirmation in Support of Defendant's Notice of Motion, November 2, 2006, ¶ 7.) The

Court, however, disagrees. As the United States Supreme Court has explained:

> Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed . (citation omitted)

*Brinegar v. United States*, 338 U.S. 160, 175-76 (1949).  More recently, the Supreme Court

clarified:

> The long-prevailing standard of probable cause protects "citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime," while giving "fair leeway for enforcing the law in the community's protection." *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). On many occasions, we have reiterated that the probable-cause standard is a "'practical, nontechnical conception'" that deals with "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quoting *Brinegar, supra*, at 175-176, 69 S.Ct. 1302); *see, e.g., Ornelas v. United States*, 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). "[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S., at 232, 103 S.Ct. 2317.
>
> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. *See ibid*.; *Brinegar*, 338 U.S., at 175, 69 S.Ct. 1302. We have stated, however, that "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt," *ibid.* (internal quotation marks and citations omitted), and that the belief of guilt must be particularized with respect to the person to be searched or seized, *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). In *Illinois v. Gates*, we noted:
>
>> As early as *Locke v. United States*, 7 Cranch 339, 348, 3 L.Ed. 364 (1813), Chief Justice Marshall observed, in a closely related context: '[T]he term "probable cause," according to its usual acceptation, means less than evidence which would

justify condemnation . . . . It imports a seizure made under circumstances which warrant suspicion.'

*Maryland v. Pringle*,  540 U.S. 366, 370-371 (2003).

The Charter and Code of the City of Rochester, New York provides in pertinent part:

B.      Consumption prohibited. No person shall consume any alcoholic beverage in a public place.

\*\*\*

C.      Possession prohibited. No person shall possess an open container of any alcoholic beverage in a public place with the intent to consume the beverage in a public place.

\*\*\*

E.      Presumptions.

(1)      Possession by a person of an open container of an alcoholic beverage in a public place shall create a rebuttable presumption that such person intends to consume the beverage in such place.

\*\*\*

G.      Penalties. A violation of this section shall be a "violation" as that term in defined in the Penal Law. A person convicted of violating this section shall be fined not less than $25 nor more than $250, and, in addition, for a second conviction within 12 months of a preceding conviction, may be imprisoned for a term not longer than 15 days. In lieu of a fine, the court may impose an appropriate alternative sentence; provided, however, that an alternative sentence shall not be an unconditional discharge.

Rochester City Code § 44-9 (1991). In this case, even if Officer Zenelovic seized the defendant for purposes of the Fourth Amendment when he directed the defendant to put the bottle down and stand up, the Court concludes that, at that point in time, he had probable cause to arrest him for a violation of Rochester City Code § 44-9 C, Possession of an Open Container of Any Alcoholic Beverage in a Public Place with the Intent to Consume the Beverage in a Public Place. More specifically, when Officer Zenelovic seized the defendant, he had observed that the defendant had in his possession a paper bag from

which one to two inches of a clear glass bottle was protruding and that the bottle itself had no cap on it. Additionally, Officer Zenelovic had concluded, based upon his experience and training as a police office and assistant grocery manager, that, because of how the top of the  bottle was shaped, because it was glass and not plastic, and because he was aware that paper bags were utilized to conceal the label on an alcoholic beverages, that it was a beer bottle and that the defendant was committing an open container violation. The Court finds that the totality of the circumstances would have  warranted "a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. at 176 (citation omitted); *see People v. Bothwell*,  261 A.D.2d 232, (N.Y.A.D. 1st Dept. 1999) leave to appeal denied, 93 N.Y.2d 1026 (1999) ("Here, Officer Tergeson, a trained officer on specific assignment to police quality of life offenses, observed defendant, engaged in conversation, holding in front of him a partially concealed open bottle resembling a beer bottle. Based on this observation, he concluded that defendant was drinking an alcoholic beverage in public.")

In reaching its conclusion on probable cause, the Court rejects the defendant's argument that the fact that Officer Zenelovic arrested the defendant for Consumption of an Alcoholic Beverage in a Public Place, a violation of Rochester City Code § 44-9 B, rather than for a violation of § 44-9 C, Possession of  an Open Container of Any Alcoholic Beverage in a Public Place with the Intent to Consume the Beverage in a Public  Place, makes the defendant's seizure illegal. In that regard, it is well settled that probable cause is an objective standard. It either exists or it does not, and the inquiry is not whether Officer Zenelovic arrested the defendant for the "right" offense, but whether  the circumstances, when viewed objectively, justified his conduct. *Scott v. United States,* 436 U.S. 128, 138

(1978);   *United States v. Dhinsa,*171 F.3d 721, 725 (2d Cir.1998);   *United States v. Nersesian*,  824 F.2d 1294, 1316 (2d Cir. 1987).

Moreover, even assuming *arguendo* that the defendant's initial seizure by Officer Zenelovic was in violation of the Fourth Amendment, the suppression of the cocaine base and marijuana sought by the defendant would not be warranted. Once Officer Zenelovic observed the defendant throw the handgun, for which suppression is not being sought and which occurred before the search of the defendant's person by Officer Dondorfer, "independent" probable cause existed to arrest the defendant.   Consequently, the search by Officer Dondorfer, which resulted in the discovery of the cocaine base and marijuana, was incident to a lawful arrest, based upon the objective existence of probable cause relating to the defendant's possession of the handgun,  independent of the Rochester City Code violation. In that regard:

> The exclusionary rule is limited to evidence which police can not trace to some "independent" and lawful source. *United States v. Marchand*, 564 F.2d 983, 993 (2d Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978) (quoting *James v. United States*, 418 F.2d 1150, 1151-52 (D.C.Cir.1969)). A violation of the Fourth Amendment should not require exclusion of evidence that was obtainable without the illegal act. *Marchand*, *supra*, at 994-995.

*United States v. Clark,*  822 F.Supp. 990, 1007 (W.D.N.Y. 1993).

B.      Motion to Suppress Statements

The defendant contends:

> There are three theories by which these statements should be suppressed: (a) the statements were the unattenuated by product of the illegal seizure and search of Gonzalo Ortiz including the seizure of the cocaine base and marijuana . . . ; (b) the initial statements were not preceded by warnings pursuant to *Miranda v. Arizona*, 387 U.S. 436 (1966) although the product of

custodial interrogation; (c) the statements were involuntarily made pursuant to 18 U.S.C. § 3501.

(Affirmation in Support of Defendant's Notice of Motion, November 2, 2006, ¶ 15.) Again the Court disagrees, and concludes that all statements of the defendant are admissible.

First, since the defendant did not move for suppression of the handgun and since the Court has already concluded that the cocaine base and marijuana were lawfully seized, the Court finds the defendant's fruit of the poisonous tree argument to be without merit. Turning to the defendant's remaining arguments, it is, of course, clear that the government may not use any statements obtained from a defendant, whether exculpatory or inculpatory, which were the product of custodial interrogation, unless prior to any questioning the defendant was advised of his constitutional rights and knowingly, intelligently and voluntarily waived such rights. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Colorado v. Spring*, 479 U.S. 564 (1987); *Edwards v. Arizona*, 451 U.S. 477 (1981). Additionally, it is well settled that the statements of a defendant themselves must be voluntary based on the "totality of the circumstances." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). A statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne. *Hayes v. State of Washington*, 373 U.S. 503, 513-14 (1963). The Government bears the burden of proving by a preponderance of the evidence both that a defendant, having been advised of his constitutional rights guaranteed under *Miranda*, knowingly, intelligently and voluntarily waived his rights, and that any statements that he made were voluntary. *Lego v. Twomey*, 404 U.S. 477, 482-89 (1972). Furthermore, while a defendant in custody may not be subjected to interrogation in the absence of Fifth

Amendment rights as guaranteed by *Miranda*:

> The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment. . . .

*Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. at 1630; *see also United States v. Carpenter*, 611 F.2d 113, 117 (5th Cir.), *cert. denied*, 447 U.S. 922, 100 S.Ct. 3013, 65 L.Ed.2d 1114 (1980) (spontaneous, unprovoked incriminating statement is admissible).

The standard for determining whether a statement is the product of interrogation is outlined in *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689-1690, 64 L.Ed.2d 297 (1980) (footnotes omitted):

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. This is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*United States v. Guido*,  704 F.2d 675, 676 -77 (2d Cir.1983).

Applying these applicable principles of law to the facts of this case, the Court finds by a preponderance of the evidence that the statements made by the defendant in the presence of Officer Zenelovic  and Officer Dondorfer in the vicinity of 72 Joseph Place were spontaneous. Neither officer said or did anything that could have reasonably been expected to elicit the statements made by the defendant. Consequently, the Court concludes that they are admissible.

As to the statements made by the defendant at the Public Safety Building first to Investigator LoFaso and  Investigator  Guidici and then to Investigator  LoFaso alone, the Court finds, by a preponderance of evidence, that they were made after the defendant was

fully advised of his *Miranda* rights and was asked specifically if he understood his rights and would give them up and speak to the police.  Further the Court finds, by a preponderance of evidence, based upon the fact that the defendant had completed eleventh grade, could read and write and was not intoxicated, that he understood, his rights and knowingly and intelligently waived his rights.

Moreover, the Court finds, by a preponderance of the evidence, that the defendant was not threatened, or subjected to any physical force or psychological coercion, or made any promises to get him to speak to the police. Finally, the Court finds, by a preponderance of evidence, that having waived his rights, at no time thereafter did the defendant indicate that he did not want to continue speaking with the police or that he wanted an attorney. Therefore, the Court finds, by a preponderance of evidence, that the defendant's statements to Investigator LoFaso and Investigator Guidici, like his statements to Officer Zenelovic and Officer Dondorfer, were in all respects voluntary.

## CONCLUSION

Accordingly, the defendant's motion (# 14) to suppress tangible evidence (cocaine base and marijuana)  and statements is denied in all respects.

IT IS SO ORDERED.


DATED:      Rochester, New York
            March 23, 2007

                            ENTER.


                            /s/Charles J. Siragusa
                            CHARLES J. SIRAGUSA
                            United States District Judge